**<u>Exhibit A</u>**
**Proof of Claim**

17209166

**Fill in this information to identify the case:**

Debtor 1    PB Restaurants, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    **Middle District of Florida**

Case number:    **25–01957**

**FILED**

**U.S. Bankruptcy Court**
**Middle District of Florida**

6/13/2025

**Jose A. Rodriguez, Clerk**

## Official Form 410
## Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Main Street Capital Corporation<br><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Main Street Capital Corporation<br>Name<br><br>Joshua W. Wolfshohl<br>1000 Main St.<br>36th Floor<br>Houston, TX 77002<br><br>Contact phone    713–226–6695<br><br>Contact email<br>   jwolfshohl@porterhedges.com<br><br>Uniform claim identifier (if you use one):    **Where should payments to the creditor be sent?** (if different)<br><br>Diego Fernandez<br>Name<br><br>1300 Post Oak Blvd.<br>8th Floor<br>Houston, TX 77056<br><br>Contact phone    713–350–6000<br><br>Contact email<br>   dfernandez@mainstcapital.com |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known)      Filed on<br>     MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ 43713278.00  **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>See attached. $43,713,278.00 is the minimum claim amount. |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ _____<br><br>**Amount of the claim that is secured:** $ _____<br><br>**Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br><br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410          Proof of Claim          page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies   $ _____

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   6/13/2025

MM / DD / YYYY

/s/  Diego Fernandez

Signature

Print the name of the person who is completing and signing this claim:

Name   Diego Fernandez

First name   Middle name   Last name

Title   Managing Director

Company   Main Street Capital Corporation

Identify the corporate servicer as the company if the authorized agent is a servicer

Address   1300 Post Oak Blvd., 8th Floor

Number   Street

Houston, TX 77056

City   State   ZIP Code

Contact phone   713–350–6000   Email   dfernandez@mainstcapital.com

## ADDENDUM TO PROOF OF CLAIM OF
## MAIN STREET CAPITAL CORPORATION

This proof of claim (the "Proof of Claim") is submitted by Main Street Capital Corporation (the "Claimant"), for itself and as agent for BDB Intermediate, LLC, MSC Income Fund, Inc., Main Street Equity Interests, Inc., and MSC Equity Holding, LLC, and all others claiming by or through them and all successors or assigns, to preserve and claim amounts owed by PB Restaurants, LLC f/k/a Planet Hollywood International, Inc. (the "Debtor")[1] to the Claimant. Claimant expressly preserves and asserts, to the extent not stayed by 11 U.S.C. § 362, any right of setoff and recoupment and demands adequate protection thereof. Claimant hereby asserts claims against the Debtor for any and all rights and entitlement that the Claimant has or may have to indemnification, contribution, reimbursement, or other payment (including damages, attorneys' fees, costs and expenses related thereto) from Debtor pursuant to applicable contractual agreements and law.

1.      Claimant is a significant creditor of the Debtor and of BUCA C LLC ("BUCA C"), which, along with certain affiliates, has a case pending under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Case No. 24-80058 (SGJ). At all times material to the Claimant's claims, the Debtor owned, through one or more direct or indirect subsidiaries, the majority of the equity interests in BUCA C.

2.      In 2015, Claimant, as a lender and the administrative and collateral agent for another lender, entered into a loan agreement with BUCA C the ("Loan Agreement"). Contemporaneously, BUCA C and the Debtor entered into an Accounting, Management and

---

[1]    The Services Agreement and the Subordination Agreement (each as defined below) were signed by Planet Hollywood International, Inc., now known as PB Restaurants, LLC, which is the Debtor. For the purposes of the Proof of Claim, any acts taken by either Planet Hollywood Internation, Inc., or PB Restaurants, LLC, will be discussed as actions taken by the "Debtor."

1

Administrative Services Agreement (the "Services Agreement"). Finally, BUCA C, Claimant, and Debtor entered into a Management Fee Subordination Agreement (the "Subordination Agreement", and together with the Loan Agreement and the Services Agreement, the "Agreements").[2] Information regarding the Agreements and the facts underlying this Proof of Claim are set forth in greater detail in the adversary proceeding filed against two insiders and three affiliates of the Debtor (Adv. No. 25-08003-sgj in the Bankruptcy Court for the Northern District of Texas). The complaint commencing that adversary proceeding is attached hereto as **Exhibit A** and is incorporated herein by reference.

3. The Debtor breached the Subordination Agreement by receiving management fees and expense reimbursements to which it was not entitled while BUCA C and its other borrowers were in default under the Loan Agreement, and by initiating or permitting other prohibited transfers to or offsets with itself or Debtor-affiliates. Relatedly, the Debtor also breached the Subordination Agreement by failing to (1) hold such payments in trust for the benefit of Claimant and the other lender, (2) segregate the payments from other funds and property held by the Debtor, and (3) turn over the prohibited payments to Claimant and the other lender. Such payments include at least $34,578,571 in expense-reimbursement payments and other prohibited transfers (over the period of September 2023 through July 2024), which includes at least $15.6 million in outflows labeled as "Funding to Shared Services" (over the period of September 2023 through mid-May 2024), and potentially more pending further investigation by Claimant. Further, there was a separate, additional $15.7 million in outflows and offsets labeled as "Funding to Shared Services" over the period of October 2022 through August 2023, some of which may have been improper

---

[2] The Agreements are voluminous and may contain sensitive trade information. Accordingly, they have not been attached to this Proof of Claim, but a copy will be provided upon request by a party in interest, subject to confidentiality restrictions.

2

and thus should be added to the roughly $34.5 million of expense-reimbursement payments and other prohibited transfers. Finally, over the period of October 2022 through March 2024, approximately $4,763,006 of management fees for indirect expenses should have been deferred.[3]

4. Those improper payments, transfers, and/or offsets—a combined amount of at least $34,578,571, but potentially up to $55.0 million or more—were also in violation of the Services Agreement. Related to the Services Agreement, the Debtor also owes the Claimant amounts stemming from breaches of the fiduciary duties of loyalty and care, which the Debtor owed to the Claimant as a third-party beneficiary. Such damages include (a) $839,974 related to Debtor's failure to timely pay rent to third-party landlords (such damages including late penalties paid, cure costs, and legal expenses associated with past-due rent), and (b) $57,642 for the diversions of bus-tour or group sales away from BUCA C or cancelled reservations of same. These amounts are apart from and in addition to the improper payments and offsets outlined previously, which are expected to be at least $34,578,571 and possibly up to $55.0 million or more.

5. Further, Debtor misappropriated intercompany funds and violated the fiduciary duty of loyalty by failing to properly allocate to BUCA C certain revenues from a gift-card program administered by Mealz Dining Pass, LLC (a company affiliated with Debtor's ultimate principal, Robert Earl). Under that program, customers could purchase multi-restaurant gift cards that could be spent at various Earl-affiliated restaurants, including but not exclusive to BUCA C's restaurants. Claimant conservatively estimates that it incurred at least $8,237,091 in damages related to the program, including any unredeemed gift-card balances and any cash retained as working capital from the program, each to the extent reasonably allocable to BUCA C.

---

[3] This $4.7 million is still being reconciled and may be a part of, or in addition to, the amounts discussed in the foregoing paragraph.

3

6.      Finally, Claimant is still investigating the nature and extent of claims it may have against the Debtor.  In addition to those described above, some such claims that are known to exist but that have unknown damages include, but are not limited to:  Debtor's failure to effectuate a transfer of the Buca di Beppo website domain and marketing services accounts, resulting in costs associated with recreating the website and working with marketing service vendors to recreate accounts; Debtor's failure to provide financial information in a timely manner; Debtor's failure to provide BUCA C with its own customer lists; loss of banquet-related sales in 2025 (due to assets being held at Debtor and not BUCA C); Debtor's failure to obtain and maintain liquor licenses (resulting in lost sales and in costs associated with applying for new licenses); and other breaches of the fiduciary duty of care owed to Claimant or BUCA C or both under the Agreements.

7.      Accordingly, as of the Petition Date, the Debtor owed the Claimant **_at least_** $43,713,278, and possibly up to $64,176,284 or more, plus all other interest and attorneys' fees to which Claimant is entitled under applicable law.  However, despite requests, Claimant has not been provided with adequate books and records supporting or accounting all payments, and Claimant has yet to calculate the full extent of its damages.  Claimant intends to amend or supplement this Proof of Claim as more information is uncovered.

8.      Claimant expressly reserves all rights and claims it has under applicable law to collect any amounts owed from non-debtor persons or entities or non-debtor property and nothing herein shall be construed to affect or impair any claims or rights Claimant has against the Debtor, property of the Debtor, non-debtors, or property of non-debtors, including without limitation the right to pursue causes of action against the principals or affiliates of the Debtor.

17269055

9. Additional information on the Claimant's interest is available upon written request to Joshua W. Wolfshohl, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002.

10. Claimant has filed this Proof of Claim under compulsion of the bar date and to protect Claimant from forfeiture of Claimant's claims against the Debtor. Claimant reserves the right to amend, update, and/or supplement this Proof of Claim at any time and in any respect, for whatever reason, and to assert any and all other claims of whatever kind or nature that Claimant has, or may have, against the Debtor that come to its attention or that arise after the filing of this Proof of Claim, including, without limitation, (a) any claims incurred prior to and after the filing of these chapter 11 cases, (b) to correct, increase, or to otherwise amend the amounts referred to herein, (c) to add or amend documents and other information, and to describe further the claims asserted herein, (d) to file additional proofs of claim for any additional claims which may be based on the same grounds of liability, and/or (e) to assert claims for any additional interest, fees, charges, attorneys' fees and expenses, or other amounts accrued before or after the Petition Date. Claimant further reserves the right to file proofs of claim for claims entitled to priority or motions seeking administrative expense priority.

11. By filing this Proof of Claim, Claimant does not waive, and hereby preserves, without limitation: (a) any obligation owed to Claimant; (b) any right or causes of action that it has or may have against the Debtor or any other person or persons; and (c) any and all rights and remedies at law or in equity available to Claimant against the Debtor and any of its affiliates or subsidiaries, or any other person or entity.

12. The filing of this Proof of Claim shall not be deemed or construed as a (a) waiver or release of any such claims or Claimant's rights against any person, entity or property;

17269055

(b) concession or admission of the validity and/or amount of any claim against Claimant; (c) concession or admission by Claimant that any claims against the Debtor are dischargeable; (d) waiver of the right to compel the Debtor to return property of Claimant currently in the possession of the Debtor; (e) waiver or release of Claimant's right to trial by jury in the Bankruptcy Court or in any other court in any proceeding concerning all matters so triable herein, whether or not designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (e) consent by Claimant to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (f) waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (g) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Claimant; (h) a waiver of any administrative expense claims that Claimant may have against the Debtor; (i) a waiver of any setoff or recoupment rights Claimant has with respect to any claims or causes of action asserted against it by the Debtor or any other party; or (j) consent to this Court's jurisdiction with respect to, or adjudication of, the claims and causes of action asserted in the Proof of Claim.

**Exhibit A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| BUCA C, LLC, | § | Case No. 24-80060 (SGJ) |
| | § | |
| Debtor. | § | |
| | § | |
| Tax I.D. No. 46-4158220 | § | |

| | | |
|---|---|---|
| ROBERT YAQUINTO, JR., as Trustee for | § | |
| BUCA C, LLC; MAIN STREET CAPITAL | § | |
| CORPORATION; MSC INCOME | § | |
| FUND, INC.; MAIN STREET EQUITY | § | |
| INTERESTS, INC.; and MSC EQUITY | § | |
| HOLDING, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Adversary No. _____ |
| | § | |
| ROBERT EARL; THOMAS AVALLONE; | § | |
| BUCA, LLC; EARL ENTERPRISES | § | |
| CORPORATE, LLC; and VIRTUAL | § | |
| DINING CONCEPTS, LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs Robert Yaquinto, Jr., in his capacity as Chapter 7 Trustee for the above-referenced BUCA C, LLC ("BUCA C") bankruptcy estate; Main Street Capital

Corporation ("Main Street"); MSC Income Fund, Inc.; Main Street Equity Interests, Inc.;

and MSC Equity Holding, LLC, by and through the undersigned counsel, file this Original

Complaint against Defendants Robert Earl ("Earl"); Thomas Avallone ("Avallone");

BUCA, LLC; Earl Enterprises Corporate, LLC ("Earl Enterprises"); and Virtual Dining

Concepts, LLC ("Virtual Dining") and respectfully show as follows:

<u>**NATURE OF THE ACTION**</u>

This action arises from the financial decline and bankruptcy of BUCA C, which

owned and operated, through subsidiaries, the chain of Italian-American restaurants known

as Buca di Beppo. PB Restaurants, LLC f/k/a Planet Hollywood International, Inc. ("PHI")

previously provided management, accounting, administrative, and clerical services to

BUCA C. Defendant Earl—a self-proclaimed "leading figure" in the food and beverage

industry—was at all material times, upon information and belief, a Manager, President,

and direct or indirect owner of PHI, and he is the guarantor of certain debts owed by BUCA

C to Main Street. Defendant Avallone was at all material times, upon information and

belief, Manager, President, and CEO of BUCA C and a Manager and officer of PHI.

As alleged herein, Earl; Avallone; BUCA, LLC; Earl Enterprises; and Virtual

Dining, individually and acting in concert, breached legal duties owed to Plaintiffs, aided

and abetted the breach of such duties owed to Plaintiffs, and tortiously interfered with the

contractual relationships between BUCA C and Main Street. Through mismanagement and

breach of fiduciary duty, their actions and inactions hastened the decline of BUCA C and

caused Plaintiffs to suffer millions of dollars in damages.

2

## <u>PARTIES</u>

BUCA C LLC is a Florida limited liability company with its principal place of business in Orlando, Orange County, Florida. On August 5, 2024, BUCA C filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Texas, Dallas Division. On February 5, 2025, the bankruptcy was converted to Chapter 7.

Plaintiff Robert Yaquinto, Jr. is the duly-appointed Chapter 7 Trustee for the above-referenced bankruptcy estate in Case No. 24-80060, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

Plaintiff Main Street Capital Corporation is a Maryland corporation with its principal place of business in Houston, Harris County, Texas.

Plaintiff MSC Income Fund, Inc. is a Maryland corporation with its principal place of business in Houston, Harris County, Texas.

Plaintiff Main Street Equity Interests, Inc. is a Delaware corporation with its principal place of business in Houston, Harris County, Texas.

Plaintiff MSC Equity Holding, LLC is a Delaware limited liability with its principal place of business in Houston, Harris County, Texas.

Defendant Robert Earl is a natural person domiciled in the State of Florida. Earl may be served with process at his home address at ███████████████████ ███████████████; at his work address at 4700 Millennia Blvd., Suite 400, Orlando, Florida 32839; or wherever else he may be found.

Defendant Thomas Avallone is a natural person domiciled in the State of Florida. Avallone may be served with process at his home address at ████████████████

3

████████████████ ; at his work address at 4700 Millennia Blvd., Suite 400, Orlando,

Florida 32839; or wherever else he may be found.

Defendant BUCA, LLC is a Minnesota limited liability company with its principal

place of business at 4700 Millennia Blvd., Suite 400, Orlando, Florida 32839. BUCA, LLC

may be served through its registered agent Michael E. Neukamm, at 301 E. Pine Street,

Suite 1400, Orlando, Florida 32801, or wherever he may be found.

Defendant Earl Enterprises Corporate, LLC is a Florida limited liability company

with its principal place of business at 4700 Millennia Blvd., Suite 400, Orlando, Florida

32839. Earl Enterprises may be served through its registered agent Michael E. Neukamm,

at 301 E. Pine Street, Suite 1400, Orlando, Florida 32801, or wherever he may be found.

Defendant Virtual Dining Concepts, LLC is a Florida limited liability company with

its principal place of business at 4700 Millennia Blvd., Suite 400, Orlando, Florida 32839.

Virtual Dining may be served through its registered agent Michael E. Neukamm, at 301 E.

Pine Street, Suite 1400, Orlando, Florida 32801, or wherever he may be found.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This matter involves claims that constitute a core proceeding within the meaning of

28 U.S.C. § 157(b)(2).

Jurisdiction is also proper over claims by Main Street pursuant to 28 U.S.C.

§ 1334(b).

This Court has personal jurisdiction over the Defendants named herein because,

upon information and belief, (a) they have conducted business in the United States and the

4

State of Texas; (b) they have executed contracts with residents and citizens of the United States and the State of Texas that call for performance in the United States and the State of Texas; and/or (c) they have sufficient minimum contacts with the United States and the State of Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice, and, in the case of BUCA, LLC, it has appeared in Case No. 24-80058 referenced above.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

### Background

The transactions underlying this lawsuit involve the chain of Italian-American restaurants known as Buca di Beppo. Buca di Beppo is well-known for its large portions, eclectic décor, and a festive atmosphere that encourages sharing and communal dining.

The original owner of Buca di Beppo, BUCA, Inc. (following conversion, BUCA, LLC), was founded in 1993. BUCA, Inc. went public in 1999, and by 2008 Buca di Beppo had developed into a national chain with eighty-nine restaurants in twenty-five states. However, mismanagement of the public company pushed BUCA, Inc. into bankruptcy. That was when Earl stepped in.

Earl is an English-American investor, restaurateur, and television personality. Among his numerous businesses and investments in the food industry, Earl founded PHI— the owner of the eponymous restaurant chain Planet Hollywood. Although PHI has filed

for bankruptcy multiple times since 1991,[1] upon information and belief, Earl retains, directly or indirectly, the majority of the equity interests in PHI. He also serves as manager and/or officer of various affiliated companies, including BUCA, LLC and PHI.

Avallone is Earl's right-hand man. While Earl is a Manager and President of PHI, Avallone also serves as a Manager as well as Executive Vice President, Treasurer, and Assistant Secretary. He also was, at all material times, the Manager, President, and CEO of BUCA C. In fact, throughout his career, Avallone has served as manager, officer, and/or director of numerous Earl-affiliated entities, including BUCA, LLC, Virtual Dining, and Earl Enterprises, which holds itself out as "a leader in the field of entertainment, leisure, tourism, hotel, and restaurant consultant services."

In 2008 Earl, through PHI, acquired BUCA, Inc. Earl implemented various changes in all areas of BUCA Inc.'s operations with the goal of improving profitability, including closing or relocating underperforming restaurants and creating a new company— BUCA C—to own and operate, through a number of direct and indirect subsidiaries, the remaining restaurants, including the Buca di Beppo restaurants. At all material times, PHI, through one or more direct or indirect subsidiaries, owned the majority of the equity interests in BUCA C.

 After turning around the business, Earl wanted to monetize his investment. But he also wanted to maintain full control. Therefore, Earl looked for sources of debt and equity so that he could take a substantial leveraged dividend. He reached out to Main Street.

---

[1] Most recently, on April 4, 2025, PHI filed a voluntary petition under Chapter 11 in No. 6:25-bk-01957-LVV, in the U.S. Bankruptcy Court for the Middle District of Florida.

6

Main Street is a Houston-based investment firm that provides long-term debt and equity capital to lower middle market companies and debt capital to middle market companies in order to support such companies' growth or transitions. Main Street ultimately agreed to make a deal with BUCA C and PHI in June 2015.

## The Loan Agreement, the Services Agreement, and the Subordination Agreement

The initial transaction among Main Street, BUCA C, and PHI was complex. Earl wanted to isolate the BUCA C assets as a standalone company while still providing managerial services to BUCA C through PHI. He also wanted capital to invest in and grow the business. However, at the same time, he wanted to take a substantial dividend.

Given these goals, it was imperative to Main Street that the profitability of BUCA C would be maintained if performance ever started to suffer. Therefore, it was a highly structured transaction with specific protections to ensure that PHI and Earl could not siphon cash for the benefit of themselves to the detriment of BUCA C and its creditors, including Main Street.

The transaction involved multiple agreements, including the following:

### The Loan Agreement

Effective June 30, 2015, Main Street, together with HMS Income Fund, Inc. n/k/a MSC Income Fund, Inc. (collectively, the "Lenders"), entered into a Loan Agreement with BUCA C and its subsidiaries (collectively, the "Borrowers"). Main Street is both a lender

under the Loan Agreement and the administrative and collateral agent for itself and the

other Lenders.[2]

Under the Loan Agreement, the Lenders agreed to make senior secured term loans

in the aggregate amount of $47 million, including an initial term loan in the amount of

$42 million and delayed term loans in the aggregate amount of $5 million (collectively, the

Term Loan"). Of the initial loan, $40 million was used to pay a large dividend that Earl

could remove from the business while maintaining the vast majority of his equity

ownership. Additionally, as part of the transaction the Lenders provided a $6 million

minority equity investment equating to a ten percent equity membership in BUCA C. This

implied a $100 million valuation. The remaining ninety percent equity membership was

owned by BUCA, LLC, an entity that is owned and/or controlled, directly or indirectly, by

an entity that also owns PHI. Therefore, at the closing of the Loan Agreement, BUCA C

received $48 million from Main Street, with $40 million used as leveraged dividend and

the remainder used to invest in and to pay expenses for the business.

<u>The Services Agreement</u>

Contemporaneously with the execution of the Loan Agreement, BUCA C and PHI

entered into an Accounting, Management and Administrative Services Agreement (the

"Services Agreement"). Under the Services Agreement, PHI was designated as Manager

and was tasked with acting as BUCA C's agent and representative while providing

---

[2] As of November 5, 2024, Main Street and MSC Income Fund, Inc. assigned, among other
things, their rights as Lenders under the Loan Agreement to Plaintiffs Main Street Equity
Interests, Inc. and MSC Equity Holding, LLC, respectively.

management services to several of BUCA C's restaurants, including Buca di Beppo. In exchange for the management services, BUCA C agreed to pay PHI a capped, annual amount, initially set at $3,000,000, for the cost of corporate level employees who were employed by PHI and who provide oversight, support, and management of operations for multiple restaurant locations ("Direct Expenses") and a capped, annual management fee, initially set at $4,400,000, paid in twelve equal monthly installments (the "Management Fee"). (*Id*. § 12(a)(2).)

Section 5 of the Services Agreement lists twenty-one separate services that PHI agreed to perform and provide to BUCA C with regard to the management, operation, maintenance, marketing, administration, finance, risk management and assessment, and servicing of BUCA C's restaurants. (*Id*. § 5(a)-(u).) Section 6 then addresses how revenues and expenses that are shared between BUCA C and other entities affiliated with PHI should be allocated. The Services Agreement provides that certain "Established Shared Expense and Revenue Items" will be allocated "in a manner consistent with prior allocations for similar types of expenses and/or revenue" (*Id*. § 6(a)) and that any new "Shared Expenses and Revenue" will be "allocated in good faith by Manager among Company and those other entities entitled to same on a reasonable basis that is consistent with existing practices". (*Id*. § 6(b).)

Under Section 11 of the Services Agreement, PHI was required to maintain separate, segregated bank accounts in the name of BUCA C. (*Id*. § 11.) Further, any funds in such accounts were not to be commingled with any other funds controlled by PHI and were to be disbursed only in accordance with the Management Agreement.

9

In fulfilling its many duties under the Services Agreement, PHI agreed to perform (1) in a diligent, careful and vigilant manner for the benefit of BUCA C and its restaurants, (2) in a manner consistent with all applicable industry standards, (3) in a manner consistent with the fiduciary duties of loyalty and care owed by a manager of a limited liability company to such company and its members, and (4) in compliance with the other principles set forth in the Services Agreement. (*Id.* § 5.) Further, PHI agreed that it would never take any actions on behalf of BUCA C that would result in BUCA C being in material breach of the Loan Agreement, absent explicit instruction from BUCA C. (*Id.* § 3(b).)[3]

The Services Agreement provides that Main Street, as a "Lender Member" within the meaning of the Services Agreement, is a third party beneficiary of the Services Agreement. (*Id.* § 30.) Further, the Services Agreement states that "Main Street Capital, as agent of the Lenders and the Lender Members, shall be entitled to enforce any rights granted to it in this Agreement and any rights of [BUCA C] hereunder[.]" (*Id.*)

The Subordination Agreement

Also contemporaneously with the execution of the Loan Agreement, BUCA C, PHI, and Main Street entered into a Management Fee Subordination Agreement (the "Subordination Agreement"). The Subordination Agreement was intended to protect the financial interests of Main Street and the other Lender in the event of defaults under

---

[3] The Loan Agreement provides that PHI's breach of a material covenant, agreement, or condition contained in the Services Agreement, coupled with PHI or BUCA C denying that either one of them has any liability or owes any further obligations under the Services Agreement, constitutes a default under the Loan Agreement.

the Loan Agreement. In fact, the execution of the Subordination Agreement was a condition precedent to the Term Loan. (2d Am. Loan Agmt. § 5.2(a)(xiv), § 1.1.)

The purpose of the Subordination Agreement was to ensure that BUCA C would not pay and PHI could not collect fees and expenses to the detriment of Main Street and the other Lender. Specifically, the Subordination Agreement subordinates PHI's receipt of certain "Management Fees" (defined to include not only the Management Fee under the Services Agreement but also "any other management, consulting, services or other similar fees paid to [PHI] or any expenses incurred by [PHI] in connection with the management of [BUCA C] and its Subsidiaries") to the prior payment ***in full*** of all of the Borrowers' financial "Obligations," as that term is defined in the Loan Agreement, including but not limited to any principal, interest, fees, expenses, and any other obligations owed by the Borrowers to the Lenders ("Senior Debt"). (Sub. Agmt. § 3; *see also* 2d Am. Loan Agmt. § 1.1 (defining "Obligations").) And the Subordination Agreement, the Loan Agreement, and the Services Agreement all work together to ensure this result.

First, the Subordination Agreement expressly prohibits PHI from accepting any Management Fees "other than Management Fees expressly permitted to be paid pursuant to the terms of the Loan Agreement," unless and until the Borrowers have paid all Senior Debt in full. (Sub. Agmt. § 3.) Next, the Loan Agreement prohibits the Borrowers from paying certain "Management Fees [as defined in the Services Agreement] or any other management, consulting, services or other similar fees to any Affiliate of the Borrowers or reimburs[ing] any Affiliate of the Borrowers for any expenses incurred in connection with the management of the Borrowers, in each case whether pursuant to the Services

11

Agreement or otherwise" if any Borrower is in a Payment Default or Specified Default. (2d Am. Loan Agmt. § 10.2.)[4] Finally, the Services Agreement provides that, if any part of the Management Fee is not payable pursuant to the terms of the Loan Agreement in connection with a default thereunder, such amount "shall also not be payable" under the Services Agreement. (Servs. Agmt. § 12(a)(2).)

**Default Under the Loan Agreement**

In January 2016 Earl caused BUCA C to make another dividend in the amount of $5 million that Earl could remove from the business, bringing the total dividend payments to $45 million. However, by 2017, the Borrowers' financial performance declined, and the Borrowers fell behind on their repayment obligations. To address those issues, on February 1, 2018, Main Street and the Borrowers entered into an Amendment to Loan Agreement which, among other things, fixed monthly amortization payments, increased financial reporting requirements, and reset financial covenants.

Then the COVID-19 pandemic occurred, and the Borrowers' performance declined substantially. The Borrowers again went into Default under the Loan Agreement by, among

---

[4] A "Payment Default" under the Loan Agreement, as described more fully below, is any default by a Borrower under Section 11.1 of the Loan Agreement. (2d Am. Loan Agmt. § 1.1.) A "Specified Default" is a default by any Borrower under specific sections of the Loan Agreement, including *inter alia* Sections 11.2(a); 11.2(b) (but only to the extent resulting from a violation of Section 8.1(a), (b), or (d)(iii)); 11.3; 11.8; and 11.13. (*Id.*) If a Payment Default exists, the Loan Agreement prohibits Borrowers from paying **any** Management Fee to PHI. (*Id.* § 10.2(a).) If no Payment Default exists but a Specified Default has occurred and is continuing, the Borrowers may only pay PHI a portion of the Management Fee for certain Indirect Expenses as defined in the Services Agreement. (2d Am. Loan Agmt. § 10.2(b)(i).) The remaining amount of the Management Fee that otherwise would have been paid to PHI for Indirect Expenses must be deferred. (*Id.*)

other things, failing to make certain quarterly amortization payments and by failing to pay in full on the maturity date. As a result, on December 3, 2020, Main Street sent a notice of Default and reservation of rights letter to the Borrowers asserting ongoing Defaults under the Loan Agreement. Main Street sent an additional Default notice and reservation of rights letter to the Borrowers on March 12, 2021.

By 2022, BUCA C and the other Borrowers were still unable to meet their obligations under the Loan Agreement. Therefore, on April 29, 2022, Main Street and the Borrowers entered into a Second Amendment and Limited Waiver to Loan Agreement ("Second Amendment") under which, among other things, Main Street waived certain Defaults and extended the Term Loan's maturity date to June 30, 2023 (2d Am. Loan Agmt. §§ 1.1 & 2.1); Earl agreed to make a subordinated loan to BUCA C in the original principal amount of $3 million (*id*. § 3.3); and Main Street required certain mandatory prepayments (*id*. §6). Additionally, BUCA C was required to use its commercially reasonable best efforts to refinance Main Street's debt or arrange a sale transaction by the June 30, 2023 maturity date. (*Id*. § 6.6.)

**Earl Provides a Personal Guaranty**

On December 21, 2022, Main Street sent an additional Default notice and reservation of rights letter. Then, in early 2023, the Borrowers approached the Lenders and requested that the Lenders waive certain payments under the Loan Agreement due on April 1, 2023 and May 1, 2023 to prevent another Default and buy time to pursue a sale process. Despite hesitations regarding PHI and Earl's ability to right the course, the Lenders were willing to do so if Earl gave a personal guaranty. Earl agreed.

13

Therefore, effective April 1, 2023, Main Street and the other Lender agreed to waive the scheduled principal payments under Section 3.2(a)(ii)(B)(5) of the Loan Agreement due on April 1, 2023 and May 1, 2023. In return for Lenders waiving immediate payments and postponing immediate action to enforce their rights and to protect their capital, Earl signed a Guaranty for the benefit of Main Street, as agent for the ratable benefit of the Lenders (the "2023 Guaranty").

Under the 2023 Guaranty, Earl "absolutely, irrevocably and unconditionally guarantee[d] the full and prompt payment by Borrowers of all interest, principal, fees and expenses due in respect of the Loans and the other Obligations" under the Loan Agreement (collectively, the "Guaranteed Obligation"). (2023 Guar. § 2.) Earl further agreed that, should the Borrowers default on the Loan Agreement, he would pay to Main Street the amount of the Guaranteed Obligation then due and payable, not to exceed a "Guaranty Cap" as defined in the 2023 Guaranty. (*Id*. § 3.)

Notably, Earl agreed that his obligation with regard to the Guaranteed Obligation would not be released, discharged, diminished, impaired, reduced or otherwise affected by, *inter alia,* any Borrower, including BUCA C, becoming insolvent or subject to bankruptcy. (*Id*. § 10.) Similarly, Earl agreed that, in the event acceleration of the time for payment of any of the Guaranteed Obligation was stayed, whether by a Borrower's insolvency, bankruptcy, or otherwise, all such amounts would "nonetheless be payable by [Earl] immediately upon demand" to Main Street. (*Id*. § 13.)

14

**Continued Default under the Loan Agreement**

Despite the Lenders' willingness to waive certain scheduled payments, the Borrowers remained in Default. Therefore, on May 2, 2023, Main Street sent another Default notice and reservation of rights letter.

Notwithstanding the previous extension to the maturity date, on June 30, 2023, the Borrowers failed to repay in full the Term Loan as required by the Second Amendment. Therefore, effective July 13, 2023, the Borrowers entered into a Third Amendment to Loan Agreement which, among other things, extended the Term Loan's maturity date from June 30, 2023 to August 31, 2023. This extension was given because Earl finally engaged a reputable third-party to sell the business. Despite facing headwinds and delays stemming from PHI's inability to produce timely financials as required by the Services Agreement, the sale process yielded an offer to purchase BUCA C and avoid bankruptcy. Earl, however, declined to pursue the offer.

Despite this extension, the Borrowers again failed to repay in full the Term Loan by August 31, 2023, and Main Street sent two additional Default notices and reservation of rights letters to the Borrowers on January 23, 2024 and April 9, 2024.

By the middle of 2024, it was clear that BUCA C was in a dire financial situation. Therefore, effective June 27, 2024, the Borrowers entered into a Fourth Amendment to Loan Agreement under which, among other things, Main Street agreed to extend a protective advance to the Borrowers for the sole purpose of making payments to the Borrowers' restructuring/financial advisor.

Then, on July 3, 2024, due to the multiple ongoing defaults under the Loan Agreement, Main Street exercised certain default-related rights and remedies to (a) have all of BUCA, LLC's membership interest in BUCA C registered in the name of its nominee, BC Nominee, LLC, (b) exercise the voting power to act in respect of the BUCA C membership interests, and (c) have BC Nominee, LLC admitted as an equity owner and substituted for BUCA, LLC as a member of BUCA C. Subsequently, BC Nominee, LLC assigned the economic interests of BUCA C back to BUCA, LLC. The effect of these transactions was that BUCA, LLC held only an economic interest in BUCA C, but was no longer a member of BUCA C and no longer had voting or consent rights or the right to participate in the management of BUCA C.

On the same day, BC Nominee, LLC adopted a written consent removing the managers of BUCA C and appointing independent managers in their stead. The independent managers removed all the officers and directors of each of the Borrowers and appointed a new Chief Restructuring Officer.

Effective the same day, the Borrowers entered into a Fifth Amendment to Loan Agreement under which, among other things, Main Street agreed to extend another protective advance in an amount not to exceed $2 million to permit the Borrowers to continue operating during the transition period away from BUCA, LLC, and assess restructuring options.

Three weeks later, the Borrowers needed additional funds. Therefore, effective July 24, 2024, the Borrowers entered into a Sixth Amendment to Loan Agreement which, among other things, provided another $2.9 million protective advance to the Borrowers.

16

**The Borrowers File for Bankruptcy**

On August 4, 2024, the Borrowers filed for Chapter 11 bankruptcy. As alleged in their first day bankruptcy filings, the Borrowers were indebted to Main Street and the other Lender in the approximate amount of $38,986,453.54 in principal and accrued unpaid interest, plus additional costs and fees. Such amount included approximately $5.05 million in prepetition protective advances.

On August 30, 2024, the bankruptcy court entered a Final Order (I) Authorizing the Debtors to Obtain Post petition Financing, (II) Granting Liens and Providing Claims with Super priority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, and (IV) Modifying the Automatic Stay (the "Final DIP Order"). Under the Final DIP Order, Main Street provided a $36.3 million DIP Facility, consisting of a $24.2 million roll-up of Prepetition Obligations and up to $12.1 million in new money. As security for the DIP Obligations, Main Street was granted liens on substantially all of the Borrowers' assets and superpriority administrative claims.

On September 30, 2024, with the consent of BUCA C, Main Street provided notice that it was terminating the Services Agreement. As a result, PHI was removed from any participation in the management of BUCA C.

On November 4, 2024, the bankruptcy court entered an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens and Liabilities, (B) Authorizing the Debtors to Assume and Assign Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief (the "Sale Order"), authorizing the Borrows to sell substantially all of their assets to BDB Intermediate, LLC

17

("BDB Intermediate") – an entity related to Main Street. The transactions approved by the Sale Order closed on the same date. The consideration for the sale included a $27 million credit bid of DIP Obligations. The Final DIP Order was modified on November 19, 2024, to extend the maturity date of the DIP Facility and increase the DIP Amount from $12.1 million to $13.1 million in new money.

As a result of the sale, the Borrowers ceased operations and transferred substantially all of their assets to BDB Intermediate. Among other things, the sale ensured the Borrowers' business continued as a going concern, preserved just under 3,000 jobs, provided for the assumption and assignment of forty-one leases, and provided for the payment of more than $6 million in cure costs and other assumed liabilities. However, the sale did not generate cash proceeds sufficient to fund a confirmable plan of reorganization. Therefore, on February 5, 2025, the bankruptcy case was converted to a case under Chapter 7. The Borrowers' bankruptcy proceeding is still pending.

**The Borrowers Remain in Default Under the Loan Agreement**

"Default" is defined in the Loan Agreement by reference to Section 11. (2d Am. Loan Agmt. § 1.1.) Section 11 then lists the various events that constitute a "Default" under the Loan Agreement  (*Id*. at § 11.)

Section 11.1 provides that a Default occurs upon the "failure of any Borrower to pay (a) the Principal Debt [the aggregate outstanding principal balance of the Lenders' loans, plus accrued and unpaid interest] on the Scheduled Maturity Date [or] (b) any mandatory prepayment of principal or interest on the date such payment is due and payable under any Loan Document." (*Id*. §§ 11.1 & 1.1 (defining "Principal Debt").) As set forth

18

in Main Street's multiple Default notices, the Borrowers have not paid in full the Principal

Debt nor have they made all mandatory prepayments of principal or interest on the due

dates under any Loan Document. Accordingly, the Borrowers have been and remain in

Default under Section 11.1. As noted above, such Default constitutes a "Payment Default"

under the Loan Agreement. (*Id*. § 1.1.)

Further, Section 11.2 of the Loan Agreement provides that a Default occurs upon

any Borrower's failure to punctually and properly perform, observe, and comply with

(1) any covenant, agreement, or condition contained in, *inter alia*, Sections 8.17 and 10 of

the Loan Agreement, and (2) any other covenant, agreement, or condition in the Loan

Agreement where such failure continues for twenty days after the earlier of a Borrower

becoming aware of such failure, or delivery of a non-compliance notice by either Main

Street or another Lender. (*Id*. § 11.2.) As described in Main Street's multiple Default

notices and above, the Borrowers have been and remain in Default under numerous Loan

Agreement provisions, including but not limited to:

- Section 3.2 regarding the Borrowers' monthly payments and payment at maturity;

- Sections 8.1(a), 8.1(b), 8.1(c), 8.1(d), 8.1(e), 8.1(l), 8.1(m) of the Loan Agreement and Section 6.3 of the Second Amendment regarding the Borrowers' obligations to regularly furnish Main Street with certain documents, including financial and entity operational documents;

- Section 8.17 regarding the Borrowers effectuating a transfer of and migration of business cash management functions from Borrowers' affiliates to the Borrowers directly;

- Section 10.1 regarding the ratio of funded debt to EBITDA; and

- Section 10.2 regarding Borrowers paying or permitting payment of Management Fees (including expense reimbursements) when Borrowers are in default of their own payment obligations under Section 11.1 of the Loan Agreement.

To date, the Borrowers have not cured all such failures. Accordingly, the Borrowers have been and remain in Default under Section 11.

**PHI Breached the Subordination Agreement**

Despite the numerous Payment Defaults and Specified Defaults under the Loan Agreement, with the knowledge and participation of Earl and Avallone, PHI repeatedly took for itself the Management Fees and made expense reimbursements in violation of the Subordination Agreement (as well as the Loan Agreement and the Services Agreement).

When PHI received a payment in contravention of the Subordination Agreement, the Subordination Agreement directs PHI to (1) hold such payment in trust for the benefit of Main Street and the other Lender, (2) segregate the payment from other funds and property held by PHI, and (3) turn such payment over to Main Street and the other Lender for the payment (or prepayment) of the Senior Debt in accordance with the terms of the Loan Agreement. (Sub. Agmt. § 10.) However, after receiving the prohibited payments, upon information and belief, with the knowledge and/or participation of Earl and Avallone, PHI failed to keep those payments in trust for the benefit of Main Street and the other Lender or to segregate those unauthorized payments from other funds. Indeed, upon information and belief, with the knowledge and/or participation of Earl and Avallone, PHI regularly failed to segregate or appropriately account for funds as it was required to do as the manager of BUCA C's business. Further, upon information and belief, with the knowledge and/or participation of Earl and Avallone, PHI regularly transferred millions of

20

dollars from BUCA C bank accounts to Earl-affiliated entities, including BUCA, LLC, Earl Enterprises, and Virtual Dining. As of the filing of this Complaint, Defendants have neither accounted for nor turned over the prohibited payments to Main Street and the other Lender.

**PHI Breached the Services Agreement**

In addition to its repeated breaches of the Subordination Agreement, PHI also repeatedly breached its managerial and fiduciary duties under the Services Agreement.

<u>PHI Made Unauthorized Payments to Earl-Affiliated Entities</u>

As noted above, Section 10.2 of the Loan Agreement prohibits BUCA C from paying certain "Management Fees [as defined in the Services Agreement] or any other management, consulting, services or other similar fees to any Affiliate of the Borrowers or reimburs[ing] any Affiliate of the Borrowers for any expenses incurred in connection with the management of the Borrowers, in each case, whether pursuant to the Services Agreement or otherwise" if any Borrower is in a Payment Default or Specified Default. (2d Am. Loan Agmt. § 10.2.)[5] Upon information and belief, PHI's payment of millions of

---

[5] A "Payment Default" under the Loan Agreement, as described more fully below, is any default by a Borrower under Section 11.1 of the Loan Agreement. (2d Am. Loan Agmt. § 1.1.) A "Specified Default" is a default by any Borrower under specific sections of the Loan Agreement, including *inter alia* Sections 11.2(a); 11.2(b) (but only to the extent resulting from a violation of Section 8.1(a), (b), or (d)(iii)); 11.3; 11.8; and 11.13. (*Id.*) If a Payment Default exists, the Loan Agreement prohibits Borrowers from paying **any** Management Fee to PHI. (*Id.* § 10.2(a).) If no Payment Default exists but a Specified Default has occurred and is continuing, the Borrowers may only pay PHI a portion of the Management Fee for certain Indirect Expenses as defined in the Services Agreement. (2d Am. Loan Agmt. § 10.2(b)(i).) The remaining amount of the Management Fee that otherwise would have been paid to PHI for Indirect Expenses must be deferred. (*Id.*)

21

dollars from BUCA C bank accounts to Earl-affiliated entities, including BUCA, LLC, Earl Enterprises, and Virtual Dining, with the knowledge and/or participation of Earl and Avallone, violated this and other provisions of the Loan Agreement. And as noted above, PHI agreed in Section 3(b) of the Services Agreement that it would not take any action on behalf of BUCA C that would result in BUCA C being in material breach of the Loan Agreement, absent explicit instruction from BUCA C. Despite numerous requests, PHI has not provided adequate books and records supporting or accounting for these payments or showing that they were made with explicit instruction from BUCA C.

<u>PHI Failed to Allocate and Collect Shared Gift Card Revenue</u>

In situations where BUCA C shares revenue with other Earl-affiliated entities, the Services Agreement obligates PHI to determine the appropriate allocation of revenue that is due to BUCA C and to promptly collect such revenue. (Servs. Agmt. § 5(p), (r).) When the shared revenue is "established" within the meaning of the Services Agreement, PHI is to follow the allocation procedure specifically outlined in Exhibit A to the Services Agreement. (*Id*. § 6(a).) When the shared revenue is not "established," PHI must allocate such revenue "in good faith" and, *inter alia*, on a "reasonable basis that is consistent with existing practices." (*Id*. § 6(b).) However, in no event is PHI to credit to any other person or entity any revenue that BUCA C or its subsidiaries has generated. (*Id*. § 7.)

Historically, BUCA C utilized a restaurant gift card program that enabled customers to purchase gift cards that could be used only at BUCA C's restaurants. Thus, when a customer purchased a gift card for a BUCA C restaurant, BUCA C would retain all revenue

from that gift card purchase, regardless of whether the customer ultimately redeemed the gift card in whole or in part.

However, following Main Street's investment in BUCA C, PHI eschewed BUCA C's gift card program and elected to participate in a program administered, upon information and belief, by Mealz Dining Pass, LLC ("Mealz"), another Earl-affiliated entity managed by Avallone. Under that program, customers could purchase multi-restaurant gift cards that could be spent at various Earl-affiliated restaurants, including but not exclusive to BUCA C's restaurants.

Upon information and belief, Mealz sold multi-restaurant gift cards at significant discounts in exchange for the benefit of (i) immediate working capital (*i.e.*, the immediate receipt of cash before the gift card is eventually redeemed) and (ii) "breakage" (*i.e.*, the remaining gift card funds that go unredeemed). Under the multi-restaurant gift card program, when a customer purchased such a gift card all of the revenue went to Mealz immediately, which improved Mealz's liquidity and financial position. It was only if a customer redeemed the gift card at a BUCA C restaurant, such as Buca di Beppo, that Mealz reimbursed or credited BUCA C for the amount the customer redeemed less the discount and certain fees taken by Mealz. All breakage remained with Mealz. In essence, Mealz pocketed all of the benefits but passed on all the costs of the gift cards redeemed at Buca di Beppo to BUCA C.

As set forth above, PHI was obligated under the Services Agreement to (1) determine, in accordance with the procedures laid out in the Services Agreement, how much breakage and other benefits received by Mealz should be allocated to BUCA C, and

(2) promptly collect such revenue from Mealz. However, in violation of those duties, with the knowledge and participation of Avallone and Mealz, PHI allowed all breakage—which BUCA C previously retained under its prior gift card program—to remain with Mealz. Mealz also kept the working capital benefit of the gift cards, holding or pocketing the cash from BUCA C associated sales which could have been used to pay the debts and obligations of BUCA C, including those owed to Main Street. Upon information and belief, a substantial amount of gift card revenue and breakage that rightfully belongs to BUCA C has been misallocated or pocketed by Mealz, PHI, or other affiliates of PHI. Despite repeated reasonable requests, Mealz and PHI have refused to provide an accounting of this scheme in violation of Section 5(t) of the Services Agreement.

Additionally, PHI was tasked with ensuring that all bank accounts that PHI maintained for BUCA C's restaurants were maintained as separate, segregated accounts in BUCA C's name and that the funds in such accounts were not commingled with any other funds controlled by PHI. (Servs. Agmt. § 11.) Upon information and belief, PHI permitted gift card revenue and breakage amounts that properly belong to BUCA C to be commingled with other funds controlled by PHI and/or its affiliates.

### PHI Failed to Pay All Rent that was Due under BUCA C's Restaurant Leases

Under Section 5(a) of the Services Agreement, PHI was required to assist with the overall operation of BUCA C and the strategic direction of BUCA C's activities including, but not limited to, "payment, utilizing funds of Company, of rent and other amounts due under Leases" to which BUCA C was a party. PHI did not do so. It repeatedly failed to pay rent on behalf of BUCA C to various landlords, resulting in significant late fees, cure costs,

24

and a resentful base of landlords that no longer wish to be associated with the Buca di Beppo brand.

### PHI Failed to Transfer Intellectual Property

BUCA C represented in the Loan Agreement that it owned or had the right to use and assign, *inter alia*, all copyrights, service marks, and trade names that are material to conducting its business, including the business of owning and operating its various restaurants and the "Buca" brand. (2d Am. Loan Agmt. § 7.8.) However, PHI has never effectuated a transfer of the Buca di Beppo website domains from BUCA, LLC to BUCA C. PHI's failure to do so violates its duties under the Services Agreement both to assist BUCA C in complying with its Loan Agreement obligations and not to take any action that would result in BUCA C being in material breach of the Loan Agreement. (Servs. Agmt. §§ 3(b), 5(q).)

### PHI Failed to Comply with Administrative Duties

Under the Services Agreement, PHI was tasked with various administrative and clerical duties, including providing accounting and bookkeeping services, remitting tax payments, developing budgets and financial projections, making periodic evaluations of BUCA C's operational departments, and providing BUCA C with corresponding oversight and consultation. (Servs. Agmt. §§ 5(b), (g), (h), (k).) PHI repeatedly failed to satisfy these responsibilities.

Main Street frequently notified BUCA C of its failure to provide Main Street with required financial documents as required under the Loan Agreement, including but not limited to (1) annual audited financial statements (including statements of income, cash

flows, balance sheets, and summaries of accounting policies), (2) weekly cash flow certificates (including projected thirteen-week cash flow forecasts, detailed cash management summary plans, and analyses of the same), (3) deferred rent summaries and accounting deficiency remediation plans, and (4) quarterly compliance certificates. (2d Am. Loan Agmt. §§ 8.1(a), (l).) But PHI—which was responsible under the Services Agreement for developing BUCA C's budgets and financial projects, aiding BUCA C in complying with its Loan Agreement obligations, and not taking any action that would result in BUCA C being in material breach of the Loan Agreement (Servs. Agmt. §§ 3(b), 5(b), (q))—did not provide all such financial information to Main Street.

Nor did PHI ever inform Main Street of any evaluation having been performed on BUCA C's operational departments. Upon information and belief, PHI never performed such an evaluation, despite its obligation to do so. (*Id*. § 5(k).)

PHI Failed to Pay FICA Taxes

Under Section 5(h) of the Services Agreement, PHI was obligated to provide "clerical support, including the filing of tax returns and the remittance of payroll and other tax deposits and payments and the filing of reports and other documents with the Internal Revenue Service and other appropriate taxing authorities having or claiming jurisdiction over the Business or any part thereof, on behalf of Company and the Business." PHI breached Section 5(h) by failing to pay the employer portion of BUCA C's FICA payroll taxes.

<u>PHI Failed to Support an Orderly Transition</u>

In Section 14 of the Services Agreement, PHI also agreed that, in connection with a termination of the Services Agreement, it "would cooperate in good faith" with BUCA C in order to transition the services. (*Id*. § 14). However, after termination of the Services Agreement, Earl and PHI made the transition as difficult and costly as possible.

For example, Earl and PHI refused to transfer control of Buca di Beppo's websites, despite those being assets of BUCA C and no longer of any value to Earl or PHI. This forced BUCA C to recreate a website in the midst of transitioning to a new manager at significant cost. This action by Earl and PHI hindered revenue by preventing online orders and reservations, and it damaged the Company's reputation.

Additionally, Earl and PHI refused to provide BUCA C with its own customer lists and marketing accounts such as OpenTable. By withholding access, Earl and PHI were able to prevent BUCA C from reaching its customers with marketing materials or using online reservation services. Through these actions, Earl and PHI further damaged BUCA C with no benefit to themselves.

Further, as part of the management services, PHI accepted catering orders for Buca di Beppo at its call center. However, following the bankruptcy filing, BUCA C received reports from customers that PHI was redirecting Buca di Beppo customers away from Buca di Beppo and toward its other brands. As a result, BUCA C had to set up its own call center in the middle of a transition to avoid additional customer losses.

## **CAUSES OF ACTION**

### **Count I**

27

**Aiding and Abetting Breach of Fiduciary Duty of Loyalty
Against BUCA, LLC, Earl Enterprises, and Virtual Dining**

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

As expressly provided under the Services Agreement, PHI owed BUCA C (and Main Street as a third-party beneficiary) a fiduciary duty of loyalty that would be owed by a manager of a Florida limited liability company to such a company and its members. This duty included refraining from putting PHI's own interests ahead of BUCA C.

PHI breached its fiduciary duty of loyalty by prioritizing the interests of PHI and other Earl-affiliated entities above those of BUCA C, including by making unauthorized payments to Earl-affiliated entities.

As affiliated companies with overlapping management, BUCA, LLC, Earl Enterprises, and Virtual Dining were at all times aware of the Services Agreement and the fiduciary duties that PHI owed thereunder.

As affiliated companies with overlapping management, BUCA, LLC, Earl Enterprises, and Virtual Dining had knowledge of, authorized, and acting in bad faith, provided substantial assistance or encouragement in PHI's breach of fiduciary duty.

As a direct and proximate result of PHI's breach of the fiduciary duty of loyalty, and BUCA, LLC, Earl Enterprises, and Virtual Dining's aiding and abetting the breach of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

Additionally, due to PHI's breach of the fiduciary duty of loyalty, and BUCA, LLC, Earl Enterprises, and Virtual Dining's aiding and abetting the breach of fiduciary duty,

BUCA, LLC, Earl Enterprises, and Virtual Dining must disgorge all amounts received in connection with PHI's management of BUCA C.

Defendants are jointly and severally liable for Plaintiffs' damages.

### Count II
### Aiding and Abetting Breach of Fiduciary Duty of Care
### Against BUCA, LLC, Earl Enterprises, and Virtual Dining

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

As expressly provided under the Services Agreement, PHI owed BUCA C (and Main Street as a third-party beneficiary) a fiduciary duty of care that would be owed by a manager of a Florida limited liability company to such a company and its members.

PHI breached its fiduciary duty of care by failing to provide management services in a diligent, careful, and vigilant manner for BUCA C's benefit or with the amount of care which an ordinarily, careful, and prudent manager would use in similar circumstances, as evidenced by PHI's failure to perform duties set forth in the Services Agreement and its mismanagement of BUCA C's funds.

As affiliated companies with overlapping management, BUCA, LLC, Earl Enterprises, and Virtual Dining were at all times aware of the Services Agreement and the fiduciary duties that PHI owed thereunder.

As affiliated companies with overlapping management, BUCA, LLC, Earl Enterprises, and Virtual Dining had knowledge of, authorized, and acting in bad faith, provided substantial assistance or encouragement in PHI's breach of fiduciary care.

As a direct and proximate result of PHI's breach of the fiduciary duty of care, and BUCA, LLC, Earl Enterprises, and Virtual Dining's aiding and abetting the breach of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

Additionally, due to PHI's breach of the fiduciary duty of care, and BUCA, LLC, Earl Enterprises, and Virtual Dining's aiding and abetting the breach of fiduciary duty, BUCA, LLC, Earl Enterprises, and Virtual Dining must disgorge all amounts received in connection with PHI's  management of BUCA C.

Defendants are jointly and severally liable for Plaintiffs' damages.

## Count III
## Breach of Fiduciary Duty owed to BUCA C Against Avallone

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

As Manager and an officer of BUCA C, Avallone owed fiduciary duties of loyalty and care to BUCA C.

Avallone repeatedly breached those fiduciary duties by allowing BUCA C to pay Management Fees and expenses to PHI, BUCA LLC, Earl Enterprises, and/or Virtual Dining to which they were not entitled as alleged above. Avallone further breached those fiduciary duties by allowing BUCA C to participate in the multi-restaurant gift card program administered by Mealz as alleged above.

Avallone's actions were not performed with a good-faith exercise of business judgment or for the benefit of BUCA C, but rather were taken in bad-faith and for the benefit of other Earl-affiliated entities.

As a direct and proximate result of Avallone's breach of the fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

### Count IV
### Aiding and Abetting Breach of Breach of Fiduciary Duty
### Against Earl, BUCA, LLC, Earl Enterprises, and Virtual Dining

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

As a result of their long-standing business relationship, Earl was at all times aware of Avallone's fiduciary duties of loyalty and care owed to BUCA C. Similarly, as affiliated companies with overlapping management, BUCA, LLC, Earl Enterprises, and Virtual Dining were at all times aware of Avallone's fiduciary duties of loyalty and care owed to BUCA C.

Earl, BUCA, LLC, Earl Enterprises, and Virtual Dining had knowledge of, authorized, and acting in bad faith, provided substantial assistance or encouragement in Avallone's breach of fiduciary duties as alleged above.

As a direct and proximate result of Avallone's breach of the fiduciary duty, and Earl, BUCA, LLC, Earl Enterprises, and Virtual Dining's aiding and abetting the breach of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

Defendants are jointly and severally liable for Plaintiffs' damages.

### Count V
### Tortious Interference with the Subordination Agreement
### Against Earl, Avallone, BUCA, LLC, Earl Enterprises, and Virtual Dining

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

31

The Subordination Agreement is a valid, enforceable contract.

PHI materially breached the Subordination Agreement as alleged above.

Earl, Avallone, BUCA, LLC, Earl Enterprises, and Virtual Dining were at all times aware of the Subordination Agreement and Plaintiffs' legal rights thereunder.

Earl, Avallone, BUCA, LLC, Earl Enterprises, and Virtual Dining intentionally and without justification, interfered with the business relationship between PHI, Main Street, and BUCA C under the Subordination Agreement by causing PHI to breach the Subordination Agreement as alleged above and/or by making and by receiving payments to which they were not entitled as alleged above. In so doing, Defendants were not acting as agents for BUCA C or PHI, nor were they acting in the best interests of BUCA C or PHI. Rather, they were acting in their own interests.

As a direct and proximate result of Defendants' tortious interference with the Subordination Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

Defendants are jointly and severally liable for Plaintiffs' damages.

### Count VI
### Tortious Interference with the Services Agreement
### Against BUCA, LLC, Earl Enterprises, and Virtual Dining

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

The Services Agreement is a valid, enforceable contract.

PHI materially breached the Services Agreement as alleged above.

32

BUCA, LLC, Earl Enterprises, and Virtual Dining were at all times aware of the Services Agreement and Plaintiffs' legal rights thereunder.

BUCA, LLC, Earl Enterprises, and Virtual Dining intentionally and without justification, interfered with the business relationship between PHI, Main Street, and BUCA C under the Services Agreement by causing PHI to breach the Services Agreement as alleged above and/or by making and by receiving payments to which they were not entitled as alleged above. In so doing, Defendants were not acting as agents for BUCA C or PHI, nor were they acting in the best interests of BUCA C or PHI. Rather, they were acting in their own interests.

As a direct and proximate result of Defendants' tortious interference with the Services Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

Defendants are jointly and severally liable for Plaintiffs' damages.

### Count VII
### Unjust Enrichment and Money Had and Received
### Against BUCA, LLC, Earl Enterprises, and Virtual Dining

Plaintiffs incorporate and re-allege in full the preceding paragraphs of this complaint as if fully set forth herein.

BUCA C conferred a benefit on BUCA, LLC, Earl Enterprises, and Virtual Dining in the form of payments to which they were not entitled as alleged above. BUCA, LLC, Earl Enterprises, and Virtual Dining voluntarily accepted and retained those benefits. Under the circumstances, it would be inequitable for BUCA, LLC, Earl Enterprises, and Virtual Dining to retain those benefits.

As a result of BUCA, LLC, Earl Enterprises, and Virtual Dining's unlawful and intentional exercise of dominion and control over money belonging to BUCA C, BUCA, LLC, Earl Enterprises, and Virtual Dining hold money that, in equity and good conscience, belongs to BUCA C.

As a direct and proximate result of BUCA, LLC, Earl Enterprises, and Virtual Dining's conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## CONDITIONS PRECEDENT

All conditions precedent to Plaintiffs' claims for relief have been performed, have occurred, or have otherwise been waived.

## PRAYER

WHEREFORE, Plaintiffs Robert Yaquinto, Jr., in his capacity as Chapter 7 Trustee for the above-referenced bankruptcy estate; Main Street Capital Corporation; MSC Income Fund, Inc.; Main Street Equity Interests, Inc.; and MSC Equity Holding, LLC respectfully request that Defendants be cited to appear and answer, and that Plaintiffs be awarded:

    a.   all categories of damages recoverable at law or equity, including compensatory, actual, direct, indirect, consequential, and incidental damages result in from Defendants' wrongful conduct;

    b.   reasonably attorneys' fees and expenses;

    c.   prejudgment and post-judgment interest;

    d.   costs of court; and

    e.   all other and further relief, legal or equitable, to which Plaintiffs are entitled.

**BECK REDDEN LLP**

By:  */David W. Jones/*
    David W. Jones
    Texas State Bar No. 00790980
    Federal Bar No. 18206
    djones@beckredden.com
    Fields Alexander
    Texas State Bar No. 00783528
    Federal Bar No. 16427
    falexander@beckredden.com

1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone:   (713) 951-3700
Facsimile:   (713) 951-3720

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS ROBERT YAQUINTO, JR., as
Trustee for BUCA C, LLC; MAIN STREET
CAPITAL CORPORATION; MSC INCOME
FUND, INC.; MAIN STREET EQUITY
INTERESTS, INC.; and MSC EQUITY
HOLDING, LLC